

FILED

NOV 2 4 2025

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>RAYMOND ANTOINE WYCHE, )<br>a/k/a "Ray," )<br>a/k/a "Ray Ray," )<br>)<br>Defendant. )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CRIMINAL NO. 2:25-cr- 138<br><br>Conspiracy to Commit Fraud in<br>Connection with Major Disaster Benefits<br>18 U.S.C. § 371<br>(Count 1)<br><br>Making False Statements<br>18 U.S.C. §§ 1001 & 2<br>(Count 2)<br><br>Bank Fraud<br>18 U.S.C. §§ 1344 & 2<br>(Count 3)<br><br>Criminal Forfeiture<br>18 U.S.C. § 982(a)(2)(A) |

## CRIMINAL INFORMATION

THE UNITED STATES ATTORNEY CHARGES THAT:

## COUNT ONE
(Conspiracy to Commit Fraud in Connection with Major Disaster Benefits)

At all times relevant to this Information, unless otherwise stated:

Introductory Allegations

1.     In March 2020, the coronavirus ("COVID-19") pandemic resulted in the
shutdown of numerous businesses and caused millions of American workers to be out of work.
On March 13, 2020, the President declared a national emergency under Section 501 of the
Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §§ 5121 *et seq.*

1

("Stafford Act"). On March 18, 2020, the President signed into law the Families First Coronavirus Response Act ("FFCRA"), which provided additional flexibility for state unemployment insurance agencies and additional administrative funding to respond to the COVID-19 pandemic. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was signed into law on March 27, 2020. The CARES Act expanded states' ability to provide unemployment insurance for many workers impacted by the COVID-19 pandemic. The CARES Act dedicated over $250 billion to give workers more access to unemployment benefits during the public health emergency. The passage of the Continued Assistance Act on December 27, 2021, and then American Rescue Plan Act on March 11, 2021, extended certain unemployment benefits to September 6, 2021.

2.      Two of the principal ways in which the CARES Act expanded unemployment benefits during the pandemic was by 1) making those benefits available for those who had not traditionally qualified, such as contractors, self-employed, and gig workers and 2) substantially increasing the amount of money paid to those who qualify for unemployment benefits. This expansion occurred in state unemployment benefit programs across the country.

3.      As of April 18, 2020, the President had declared that a major disaster existed in all States and territories under Section 401 of the Stafford Act. On August 8, 2020, to further offset the pandemic impact on American workers, the President authorized the Federal Emergency Management Agency ("FEMA") to expend up to $44 billion from the Disaster Relief Funds for lost wage payments. The President authorized the FEMA Administrator to provide grants to participating states, territories, and the District of Columbia to administer delivery of lost wages assistance ("LWA") to those receiving unemployment insurance.

2

4.      The Virginia Employment Commission ("VEC") was responsible for administering the unemployment insurance ("UI") compensation program in Virginia. It was located in Richmond, Virginia, which is within the Eastern District of Virginia. This unemployment insurance compensation program provided temporary financial assistance to individuals who become unemployed through no fault of their own. Prior to the expanded benefits resulting from the COVID-19 pandemic, eligible recipients received a minimum of $158 per week in traditional unemployment benefits.

5.      The VEC divided the unemployment compensation program into the following four UI benefit components based upon the CARES Act, the Continued Assistance Act, the American Rescue Plan Act, and the FEMA LWA authorization:

i.      Federal Pandemic Unemployment Compensation Program ("FPUC") – The CARES Act increased benefits for workers collecting unemployment benefits by $600 per week for claims effective on or about March 29, 2020, through on or about July 31, 2020, thereby increasing the weekly benefit to $758 per week. The Continued Assistance Act reinstated FPUC at a reduced amount of $300 per week beginning on or about December 25, 2020. The Continued Assistance Act and the American Rescue Plan Act extended the benefits until on or about September 6, 2021.

ii.     Pandemic Unemployment Assistance ("PUA") – The CARES Act expanded unemployment benefits for up to 39 weeks of benefits for individuals who did not qualify for traditional unemployment benefits, including the self-employed, independent contractors, and gig workers or those who are unemployed, partially employed, unable to work, or unavailable to work due to specific COVID-19 related reason(s). The PUA

3

benefit expansion applied to weeks of unemployment beginning on or about January 27, 2020 through on or about December 31, 2020. The Continued Assistance Act and the American Rescue Plan Act extended FPUC from on or about December 26, 2020 until on or about September 6, 2021. In order to qualify for PUA, applicants had to first apply for traditional unemployment benefits, be denied, and then file a new application for PUA benefits.

iii.    Pandemic Emergency Unemployment Compensation ("PEUC") – The CARES Act provided up to 13 weeks of unemployment insurance benefits to those who exhausted their eligibility, and applied to weeks of unemployment from on or about March 29, 2020 through on or about December 31, 2020. The Continued Assistance Act and the American Rescue Plan Act extended FPUC from on or about December 26, 2020 until on or about September 6, 2021.

iv.    Lost Wages Assistance ("LWA") – The FEMA LWA authorization provided an additional $300 per week to claimants in Virginia who were eligible for at least $100 per week in unemployment insurance compensation. For claimants in Virginia, LWA was automatically paid out in one lump sum of $1,800 on or about October 15, 2020, for six weeks of unemployment between on or about August 1, 2020 (soon after the $600/week PUA benefits expired), and on or about September 5, 2020, so long as the claimant had certified unemployment eligibility during that time period. LWA funds were federal monies distributed as a result of the presidential disaster declaration, but their distribution was administered by the VEC.

6.    Unemployed workers who were not traditionally eligible for regular UI were first

4

required to file for regular UI benefits, wait for the application to be denied, then apply for the PUA program. Once the PUA claim was accepted, unemployed workers were not required to file separate claims for FPUC, and LWA benefits. Rather, an existing approved PUA claim resulted in automatic approval for and payment of FPUC ($600/week) and LWA ($300/week) benefits.

7.      Unemployed workers in Virginia could file for unemployment benefits either by phone or through the VEC Internet portal. To be eligible for UI benefits, the claimants must have been separated from their employer or had their hours reduced by their employer.

8.      The VEC application for an unemployment claim required entry of personally identifiable information, including Name, Date of Birth, Social Security Number, Physical Address, Phone Number. It also required answering a series of questions to verify eligibility, such as work history, name of the employer, the reason for separation, that the applicant is ready, willing, and able to work, and, to qualify for PUA, that the applicant lost their job due to COVID-19. In addition, as an extra verification step, the applicant could choose to answer a security phrase.

9.      Once the VEC approved a claim, claimants had to re-certify their unemployment status on a weekly basis. The claimant had to certify that they are ready, willing and able to work each day during the weeks they claimed entitlement to unemployment benefits. Both initial applications and weekly re-certifications were attested to as truthful under penalty of perjury. The VEC Internet portal captured the IP address when there is an account log-in, such as to file an initial claim or to conduct the weekly recertification.

10.     VEC processed unemployment insurance applications and recertifications on its

server located in Sandston, Virginia, in the Eastern District of Virginia. Following an unemployment application, the VEC automatically sent mailings to the address of record of the applicant from its office in Richmond, Virginia.

11.    Successful applicants could choose whether to have VEC deposit their unemployment benefits directly in a linked bank account, or loaded onto a prepaid debit card (typically called "Way2Go" cards) which was shipped to the applicant via the United States Postal Service ("USPS") or via private or commercial interstate carrier, such as FedEx, to the physical address listed on the application. For applicants who chose a Way2Go debit card, a Personal Identification Number ("PIN") for the card was sent to the address listed on the application in a separate mailing. The prepaid debit cards were automatically reloaded with newly disbursed funds via electronic transfers using the Internet. These prepaid debit cards were specific to each unemployment beneficiary, and marked with the beneficiary's name and a unique account number that links the card to the beneficiary's unemployment benefits.

12.    When an unemployment claim was filed or after a claimant changed the payment method connected to an unemployment claim, the online system employed by the VEC created a record in the internal system as a new payment method. Once a weekly certification was made, the system evaluated that claim to make sure there were no holds on the claim. For direct deposit claims, once it was determined that a payment is required, the system created a record of all payments needed and created an ACH file that was sent from the VEC server in Sandston to a SunTrust Bank server located in Atlanta, Georgia, instructing SunTrust to move money from the VEC Trust Fund account to a VEC Payments account. SunTrust then created electronic transfers through ACH to the claimant's direct deposit account recorded on the originating ACH file. For

claims paid via Way2Go cards, VEC sends the "demographic file" on a daily basis via a secure

SFTP file transfer connection through their servers located in Sandston, VA to create new

unemployment insurance claimant account and to designate funding for both new and existing

claimant accounts to Conduent servers located in Sandy, UT.  Additionally, VEC sends money

via ACH to fund the Way2Go debit card accounts from its SunTrust bank account in Virginia to

Comerica Bank located in Detroit, Michigan via Richmond Federal Reserve.

      13.     Under the CARES Act, the VEC approved PUA benefits for workers who

normally would not qualify for unemployment benefits, to include the self-employed,

freelancers, and independent contractors.  Such workers typically don't have a wage history for

the VEC to verify.  Based on this PUA change, the VEC had to rely on and trust the information

provided by the claimant, as the VEC could not quickly verify the information.  In an effort to

ensure workers who were unemployed due to the pandemic received their benefits in a quick

manner, the VEC processed and paid out these claims shortly after the claims were submitted.

The certification of those self-employed did not initially require any documentary evidence to be

provided in support of that certification.

      14.     In or around June 2020, the VEC began reviewing unemployment claims to

identify potentially fraudulent claims.  By August 2020, VEC officials had learned from other

states that inmates in correctional facilities were receiving unemployment benefits.  Incarcerated

individuals are not available for employment, nor are they able to seek full time employment.

Further, these individuals are unemployed due to their own criminal conduct and not due to the

COVID-19 pandemic.  For those reasons, they are not eligible to receive unemployment benefits,

including PUA, LWA, and FPUC.

15.    From in and around January 2020 through in and around October 2020, defendant RAYMOND ANTOINE WYCHE was incarcerated at Western Tidewater Regional Jail ("WTRJ"), in Suffolk, Virginia, in the Eastern District of Virginia. Co-conspirator ("CC") CC-1 was on federal supervised release and resided in the Eastern District of Virginia. WYCHE knew that CC-1 was on federal supervised release.

### Conspiracy to Defraud

16.    From in and around June 2020, through in and around September 2021, in the Eastern District of Virginia and elsewhere, the defendant, RAYMOND ANTOINE WYCHE, a/k/a "Ray," a/k/a "Ray Ray," and others known and unknown, knowingly and intentionally combined, conspired, confederated and agreed to commit an offense against the United States and to defraud the United States and an agency thereof. Specifically, the defendant, and others known and unknown, conspired to falsify, conceal, and cover up by a trick, scheme, and device a material fact, to make materially false, fictitious, and fraudulent statements and representations, and to make and use false writings and documents knowing the same to contain materially false, fictious, and fraudulent statements and representations, in a matter involving a benefit authorized, transported, transmitted, transferred, disbursed, and paid in connection with a major disaster declaration under section 401 of the Stafford Act, in a circumstance where the authorization, transportation, transmission, transfer, disbursement, and payment of the benefit was in and affected interstate and foreign commerce, the benefit was transported in the mail at any point in the authorization, transportation, transmission, transfer, disbursement, and payment of that benefit, and the benefit was a record, voucher, payment, money, and thing of value of the United States, and a department and agency thereof, in violation of Title 18, United States Code, Section 1040.

.17.    The purpose of the conspiracy was for the defendant and others known and unknown to profit personally by obtaining tens of thousands of dollars in unemployment benefits to which they were not entitled during the COVID-19 pandemic.

18.    The ways, manner and means by which the defendant sought to accomplish this conspiracy included, but were not limited to, the following:

    a.  WYCHE provided the personally identifiable information ("PII") over recorded jail calls, including names, dates of birth, and social security numbers ("SSN"), of other inmates housed with him at WTRJ whom he had spoken to about the scheme, to CC-1, whom WYCHE had also spoken to about the scheme, so that CC-1 and others known and unknown could file fraudulent unemployment claims in the inmates' names with the VEC.

    b.  For the initial unemployment applications to be successful, the individual(s) filing the claims had to provide numerous false inputs in required fields on the VEC website. This included a false physical address, telephone number, e-mail address, and last employer. The claims never listed the inmates' true address— i.e., correctional centers—as the claim address, and the last employer was sometimes a wholly fabricated entity. Many inputs overlapped from claim to claim, including repeated addresses in the Eastern District of Virginia. The individual(s) filing the claims further falsely certified that the inmates were unemployed through no fault of their own due to the COVID-19 pandemic, and that they were ready and willing and able to work.

9

c.  As a result of this false information, WYCHE and CC-1 caused the VEC to initiate the mailing of Way2Go debit cards that were loaded with unemployment insurance benefits, and mailed to the addresses used for the claims, which addresses were in the Eastern District of Virginia. Most of the claim proceeds were withdrawn via cash or Western Union money orders. WYCHE and CC-1 kept the vast majority of the claim proceeds for themselves.

d.  CC-1 and others known and unknown and others repeated false recertifications for the claims on a weekly basis for months to ensure benefits would continue to be paid.

e.  In sum, the conspiracy described above resulted in the filing of approximately six successful unemployment claims with the VEC using inmates' PII. WYCHE and CC-1 also attempted other claims which were not approved. As a result of the conspiracy, VEC approved and paid approximately $112,508 in unemployment benefits for claims in the name of inmates who were not entitled to receive such benefits. These monies included LWA funds resulting from the President's major disaster declaration and funds authorization.

f.  In addition to the fraudulent inmate claims, through unknown means WYCHE also obtained Way2Go debit cards in the names of individuals who did not consent to or have knowledge of their PII being used for Virginia unemployment claims. The claims falsely listed addresses in the Eastern District of Virginia even though the individuals did not live in Virginia.

10

19.     In furtherance of the conspiracy and to effect the purpose thereof, the following overt acts, among others, were committed in the Eastern District of Virginia and elsewhere:

a.  On a recorded jail call on or about June 4, 2020, WYCHE provided his own PII to CC-1 to file WYCHE's claim for unemployment benefits.  An application for unemployment benefits using WYCHE's information was filed on or about July 3, 2020.  VEC approved the claim, and ultimately disbursed approximately $33,592, including LWA funds, which was loaded on a Way2Go debit card mailed to WYCHE's mother's address in Chesapeake, Virginia.  The claim was weekly recertified through in and around September 2021, including time periods when WYCHE was incarcerated and, after his release from custody, while he was employed.

b.  On the same call on or about June 4, 2020, WYCHE said he has three other names he could give CC-1 the PII for.  Later that day, on a recorded jail call, WYCHE called his mother and told her CC-1 would be calling her to get her address so that the unemployment benefits could be sent there.

c.  On a recorded jail call on or about the following day, June 5, 2020, WYCHE gave CC-1 the PII for another WTRJ inmate, D.W., and then had a second WTRJ inmate, J.B., come on the phone to pass his own PII to CC-1.  WYCHE told CC-1 he told the inmates they would be receiving $1,500 for their claim, and WYCHE and CC-1 discussed that the claims for D.W. and J.B. would yield more than $6,000 each.  An application for unemployment benefits using D.W.'s information was filed on or about June 9, 2020.  VEC approved the

claim, and ultimately disbursed approximately $10,170, which was loaded on a Way2Go debit card mailed to an address in Norfolk, Virginia. The claim was weekly recertified through in and around June 2020; D.W. was incarcerated for the entire time period that claim benefits were paid. On a recorded jail call on or about the same day, CC-1 told WYCHE that D.W.'s claim was approved but that WYCHE should not tell D.W. so that WYCHE could keep all the money for himself, or to only give him $500. An application for unemployment benefits using J.B.'s information was filed on or about July 13, 2020. VEC approved the claim, and ultimately disbursed approximately $14,940, including LWA finds, which was loaded on a Way2Go debit card mailed to an address in Chesapeake, Virginia. The claim was weekly recertified through in and around October 2020; J.B. was incarcerated for the entire time period that claim benefits were paid.

d. On or a recorded jail call on or about June 7, 2020, WYCHE gave CC-1 the PII for another WTRJ inmate, T.M. An application for unemployment benefits using T.M.'s information was filed on or about July 7, 2020. VEC approved the claim, and ultimately disbursed approximately $22,758, including LWA funds, which was loaded on a Way2Go debit card mailed to an address in Chesapeake, Virginia. The claim was weekly recertified through in and around February 2021; T.M. was incarcerated for the entire time period that claim benefits were paid.

e. On a recorded jail call on or about June 9, 2020, WYCHE gave CC-1 the PII for another WTRJ inmate, D.J. An application for unemployment benefits using D.J.'s information was filed on or about the same day. VEC approved the claim, and ultimately disbursed approximately $16,108, including LWA funds, which was loaded on a Way2Go debit card mailed to an address in Norfolk, Virginia. The claim was weekly recertified through in and around September 2021; D.J. was incarcerated for the entire time period that claim benefits were paid.

f. On a recorded jail call on or about June 14, 2020, CC-1 asked WYCHE how much of a cut he has to give the inmates who provided their PII, and WYCHE said he may not give them anything; WYCHE and CC-1 eventually agreed each inmate who provided their PII would get $500, CC-1 would get $4,000 per claim, and WYCHE would keep the rest.

g. On recorded jail calls on or about July12, 2020, and July 13, 2020, WYCHE gave unknown individuals the PII for A.M., who was then an inmate at WTRJ. An application for unemployment benefits using A.M.'s information was filed on or about July 19, 2020. VEC approved the claim, and ultimately disbursed approximately $14,940, including LWA funds, which was loaded on a Way2Go debit card mailed to an address in Chesapeake, Virginia. The claim was weekly recertified through in and around October 2020; A.M. was incarcerated for the entire time period that claim benefits were paid.

13

(In violation of Title 18, United States Code, Section 371.)

## COUNT TWO
(Making False Statements)

20.     The United States Small Business Administration (SBA) was an executive-branch agency of the United States government that provided support to entrepreneurs and small businesses.  The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

21.     As part of this effort, the SBA enabled and provided for loans through banks, credit unions and other lenders.  These loans have government-backed guarantees.  In addition to traditional SBA funding programs, The Coronavirus Aid, Relief, and Economic Security ("CARES") Act, which was signed into law in or around March 2020, established several new temporary programs to address the COVID-19 pandemic.  One of these new programs was the Paycheck Protection Program ("PPP"), which provided for loans as a direct incentive for small businesses to keep their workers on the payroll.  The purpose of loans issued under the PPP was to enable small businesses suffering from the economic downturn to continue to pay salary or wages to their employees.

22.     The PPP application process required applicants to submit a loan application signed by an authorized representative of the business.  In order to obtain a PPP loan, the applicant was required to acknowledge the program rules, make certain certifications to the SBA, and provide certain supporting documentation.  The application contained information, among other things, as to the purpose of the loan, the business's income, average monthly payroll, number of employees

14

and background of the business and its owner. These figures were used by the lender to calculate the amount of money the small business was eligible to receive under the PPP. Applicants were also required to make good faith certifications, including that economic uncertainties have necessitated their loan requests for continued business operations and that they intend to use loan proceeds only for the authorized and not any duplicative purposes.

23.    The SBA oversaw the PPP. However, individual PPP loans were issued by private, approved lenders who received and processed PPP applications and the supporting documentation, and then made loans using the lenders' own funds, which were 100% guaranteed by the SBA. The lenders relied on the accuracy of the information contained in the PPP applications and supporting documents. Data from PPP applications, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender, or by a partner on the lender's behalf, via wire to the SBA in the course of processing the loan. If a PPP loan application was approved, the lender funded the PPP loan using its own monies, and such loans were guaranteed by the SBA. Under the PPP program rules, loan proceeds could only be spent on specific expenses authorized by the SBA, *i.e.*, payroll costs, interest on mortgages, rent, and utilities.

24.    During the relevant time period, WYCHE resided in the Eastern District of Virginia. He did not own any business and no legitimate business existed called "Wyche Services."

25.    WYCHE provided his information to CC-2 so CC-2 could file a fraudulent PPP application. CC-2 submitted the PPP application on or about April 15, 2021. On the application, CC-2 falsely stated that WYCHE was the sole proprietor and employee of a business called

"Wyche Services" which was established in 2017, based in Suffolk, Virginia, and engaged in landscaping services. CC-2 further falsely stated that the business's gross annual income for 2020 was approximately $98,740, and attached a fraudulent IRS Form 1040, Schedule C, as purported supporting documentation. WYCHE's driver's license and photograph, which WYCHE had provided to CC-3, were attached to the application.

26.     The application certified, under penalties of criminal sanctions including prosecution under 18 U.S.C. § 1001, that the business was in operation on February 15, 2020, needed the PPP loan due to current economic certainty, and promised to use PPP loan proceeds for payroll and other specific business expenses.

27.     The application was processed by an Arizona-based lender, which was a Community Development Financial Institution that provides financial products and services for small businesses to promote community economic development. The lender approved WYCHE's application on or about May 13, 2021, and accordingly disbursed approximately $20,570 to WYCHE's Langley Federal Credit Union Account on or about May 27, 2021. WYCHE withdrew the PPP loan proceeds in cash on or about the following day.

28.     On or about April 15, 2021, in the Eastern District of Virginia and elsewhere, the defendant, RAYMOND ANTOINE WYCHE, a/k/a "Ray," a/k/a "Ray Ray," in a matter within the jurisdiction of the executive branch of the government of the United States, knowingly and willfully made a materially false, fictitious, and fraudulent statement and representation and made and used a false writing and document knowing the same to contain a materially false, fictitious, and fraudulent statement and entry, and aided and abetted the same, to wit, false statements to the Small Business Administration on a Paycheck Protection loan application using a fabricated

business and by submitting a fictitious 2020 Internal Revenue Service Form 1040 Schedule C as supporting documentation for the application, all for the purpose of obtaining $20,570 in government-guaranteed loans through the PPP.

(In violation of Title 18, United States Code, Sections 1001 & 2).

### COUNT THREE
(Bank Fraud)

29.    From in and around November 2021 to in and around December 2021, in the Eastern District of Virginia and elsewhere, the defendant, RAYMOND ANTOINE WYCHE, a/k/a "Ray," a/k/a "Ray Ray," did knowingly execute a scheme and artifice to defraud a financial institution and to obtain moneys, funds, credits, assets, securities and other property owned by and under the custody and control of a financial institution by means of materially false and fraudulent pretenses, and aided and abetted the same.

30.    The purpose of the scheme was for the defendant and others known and unknown, including CC-3 and CC-4, to profit personally by depositing counterfeit checks drawn on the Truist Bank account of a car dealership based in Hampton Roads (hereinafter, "Victim Car Dealership").

31.    The ways, manner and means by which the defendant and others known and unknown who were involved in the scheme sought to accomplish the scheme included, but were not limited to, creating counterfeit paper checks using the actual banking information, including routing and account number, of an actual Truist Bank account of the Victim Car Dealership. The checks were fraudulently made out to the true names and addresses of the defendant and others known and unknown, who had no legitimate entitlement to payment from the Victim Car Dealership. The defendant and others known and unknown would sign the checks and then

17

negotiate them at locations including grocery stores and financial institutions, and withdraw the proceeds in cash.

32.     Truist Bank, formerly known as SunTrust Bank, was an insured depository institution, and qualified as a financial institution as defined under Title 18, United States Code, Section 20. Langley Federal Credit Union was a credit union with accounts insured by the National Credit Union Share Insurance Fund, and qualified as a financial institution as defined under Title 18, United States Code, Section 20.

33.     On or about December 7, 2021, the defendant, RAYMOND ANTOINE WYCHE, a/k/a "Ray," a/k/a "Ray Ray," did knowingly execute the aforesaid scheme and artifice and aided and abetted the same, to wit: WYCHE deposited a counterfeit check in the amount of $4,500 from the SunTrust Bank account of the Victim Car Dealership that was made out to WYCHE at his home address in Chesapeake, Virginia, into his personal Langley Federal Credit Union bank account.

(In violation of Title 18, United States Code, Sections 1344 and 2.)

18

## CRIMINAL FORFEITURE

1.      Defendant RAYMOND ANTOINE WYCHE, if convicted of the violation alleged in Count Three of this Information, shall forfeit to the United States, as part of the sentencing pursuant to Federal Rule of Criminal Procedure 32.2, any property constituting, or derived from, proceeds obtained directly or indirectly, as the result of the violation.

2.      If any property that is subject to forfeiture above is not available, it is the intention of the United States to seek an order forfeiting substitute assets pursuant to Title 21, United States Code, Section 853(p) and Federal Rule of Criminal Procedure 32.2(e).

3.      The property subject to forfeiture includes, but is not limited to, the following property:

      a.   A monetary judgment in the amount of not less than $4,500, which represents the proceeds of the fraud scheme alleged in Count Three, which the defendant obtained.

(In accordance with Title 18, United States Code, Section 982(a)(2)(A)).

19

*United States of America v. Raymond Antoine Wyche*
2:25-CR- 138

LINDSEY HALLIGAN
UNITED STATES ATTORNEY

By: _____

E. Rebecca Gantt
Assistant United States Attorney
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, VA 23510
Office Number - 757-441-6331
Facsimile Number - 757-441-6689
E-Mail Address – rebecca.gantt@usdoj.gov